Filed 3/13/14  E.B. v. Super. Ct. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| E.B.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Real Party in Interest. | F068570<br><br>(Super. Ct. No. 516585)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Carin L. Johnson, for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*       Before Cornell, Acting P.J., Kane, J, and Franson, J.

Petitioner, E.B. (mother), filed an extraordinary writ petition (Cal. Rules of Court, rule 8.452) regarding her minor child, Naomi S. (Naomi). Mother seeks relief from the juvenile court's order issued at the six-month status review hearing (Welf. & Inst. Code, § 366.21, subd. (e)) [1] setting a section 366.26 hearing for April 11, 2014. We will deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prehearing Events*

A detention report filed February 7, 2013,[2] filed by the Stanislaus County Community Services Agency (agency) states the following: Naomi was born in November 2012. On January 10, she was brought by ambulance to Emanuel Hospital, "because she had stopped breathing." Mother and M.S. (father), Naomi's father, were directed to take Naomi to Madera Children's Hospital (MCH), and the child was "discharged with a diagnosis of reflux and was provided with medication."

On January 28, Naomi was again transported to Emanuel Hospital by ambulance "for not breathing." Following a CT scan, which showed "new and old bleeding on the brain," she was taken to MCH where she underwent surgery. The postoperative diagnosis was "large subacute subdural hematomas bilaterally," and further evaluation revealed that Naomi had also suffered "bilateral retinal hemorrhages." The physician who performed the operation "reported that Naomi is a victim of shaken baby syndrome," and informed mother and father that Naomi had suffered a "traumatic injury" caused by "someone."

As of February 7, neither mother nor father "ha[d] been able to provide an explanation" as to how Naomi suffered her injuries. On February 5, mother told a social

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated. We refer to section 366.21, subdivision (e) as section 366.21(e).

[2] Except as otherwise indicated, all further references to dates of events are to dates in 2013.

2

worker the following:  On January 10, "the father was alone with the child and … had left her in the swing with the bottle propped up.  When he returned to the room soon after, [Naomi] had stopped breathing and was beginning to turn purple."  On January 28, Naomi "woke up crying as if she was in pain," fell asleep again, awoke again, and "was breathing very shallowly."

A report filed by the agency on April 3 (April 3 report), in advance of the jurisdiction hearing, stated that the other members of the household—Naomi's maternal grandparents and maternal aunt and uncle—were interviewed, and "no other explanations [of the cause of Naomi's injuries] were produced."  On February 5, Naomi was taken into protective custody.  A section 300 petition was filed on February 7, and on February 8, the court ordered Naomi detained in foster care.

The April 3 report further stated the following:  Father stated that in the January 10 incident, he "may have set [Naomi] down too hard onto the ground."  The physician who treated Naomi at MCH on January 10, and was the "child abuse doctor on call" when Naomi was brought back to MCH on January 29, opined that Naomi's injuries were "highly indicative of non-accidental trauma" and "had to have been" caused by "violent shaking," and that her "hematomas alone could not have been caused from setting the child down too hard."

On February 8, the agency referred mother to Sierra Vista Child and Family Services (Sierra Vista) for parenting classes, individual counseling, and a clinical assessment.  By April 3, mother had completed three parenting classes and had undergone a clinical assessment.  She completed her parenting classes on May 16.

On March 4, it was learned that Naomi had also suffered a fractured tibia.  The examining physician "could not date" this injury, which "was healing."  Mother and father "have been cooperative with the Agency, other than providing … a viable reason to how [*sic*] the injuries [to Naomi] occurred …."  "[B]ecause of the severity of the

injuries and the lack of an explanation as to the abuse of Naomi, the Agency …
recommend[ed] that the parents be denied reunification services ….”

On May 21, an amended section 300 petition was filed.[3]  On June 11, at what was
apparently a combined jurisdiction and disposition hearing, the court found the
allegations of the amended petition true, adjudged Naomi a dependent child (§ 300),
ordered her removed from the custody of her parents, and ordered that the agency file a
case plan with the court within 10 days.  The court’s written order stated that “[t]he
extent of progress which has been made toward alleviating or mitigating the causes
necessitating placement has been,” for both mother and father, “good.”

On June 21, the agency filed a case plan, which included the following two service
objectives:  (1) “The parents shall identify the perpetrator and be protective.”  (2) “The
parents shall recognize the injuries to the child were not accidental and shall explain the
causes of the injuries consistent with the medical findings.”  On July 9, the court ordered
the second of these objectives amended to delete the words “and shall explain the causes
of the injuries.”  On July 31, the court filed the amended case plan, with the ordered
modification, so that the modified objective read:  “The parents shall recognize the
injuries to the child were not accidental consistent with the medical findings.”[4]

Clinical psychologist Edward A. Moles, Ph.D., conducted the psychological
evaluation, meeting with mother on July 30, August 14 and September 3.  In his report,
which was faxed to the agency on September 6, he stated the following:  Mother stated
that on January 10, she had left Naomi with father, who told mother later that he had left
Naomi on the swing and that when he returned she was turning blue.  When Dr. Moles

---

**3**    A January 29 social worker’s case log note states that “[Naomi] was transported to
[MCH] due to a skull fracture,” and it was alleged in the initial petition that Naomi had
suffered a skull fracture.  However, a January 29 physician’s note states there was “no
evidence of fracture on CT of the head.”  The allegation of a fractured skull was deleted
in the amended petition.

**4**    We sometimes refer to this treatment plan objective as the recognition objective.

asked mother if she thought father "had done something to Naomi," mother "seemed confused about [father's] responsibility in this and seemed to want to believe that he did nothing wrong." Mother was "hesitant to accept" that father was responsible for Naomi's injuries. "Her need to maintain the relationship with her husband appeared to be a primary concern." Mother "has acknowledged that her husband must have done something to injure their child" but "she has done nothing to engage in behavior reflecting this concern and seems passively accepting of him and his story." Mother reported that in May she, father and Naomi moved out of her family's home and into their own home.

Dr. Moles opined that the failure of mother and father to account for Naomi's serious injuries is "striking," and stated that with such injuries and "no understanding of causation[,] there is a significant concern that the injuries would continue if [Naomi] is returned [home]." Dr. Moles recommended that Naomi not be returned to mother unless mother "is in a stable independent living situation separate from [father]," and that she "continue the parenting and individual counseling services at Sierra Vista."

In August, Maryanne Cose, mother's counselor at Sierra Vista, in an email to agency social worker Christine Shahbazian, stated that mother "feels that the injuries [to Naomi] were a result of [father] performing CPR."

A status review report authored by Shahbazian and filed October 18, states the following: Shahbazian met with mother on September 10. Mother had prepared a written "general" plan for keeping Naomi safe. When asked how the plan was "specific to Naomi's injuries," mother stated she was "leaving" father and moving back in with her family. She requested "separate visits from [father]." She had not previously informed her counselor at Sierra Vista of her plan to leave her husband "as this was a new decision." When asked "why she made this decision now," mother responded "she had been confused before." Throughout this meeting mother "indicated she believed [father] was responsible for Naomi's injuries."

Also on September 10, Naomi's foster mother telephoned Shahbazian and told the social worker that on the previous day, mother had stated "she was going to blame her husband, move back with her parents and then get Naomi back," and that thereafter "she would move back with her husband and be a family again."

On September 24, Shahbazian spoke with mother by telephone. When the social worker told mother that Naomi's foster mother had reported mother's professed intention to move back in with father, mother "stated this was not true; those words never came out of her mouth." Mother also "indicated the injuries were nonaccidental and she believed her husband was responsible but she didn't know what happened as the injuries happened while [Naomi] [was] in [father's] care on [January 10]."

On September 26, Shahbazian met with father, who stated that "he and his wife no longer see each other or call each other."

Also on September 26, Shahbazian again met with mother. Mother stated the following: "[S]he believed that on [January 10] [father] propped Naomi up with a bottle and left her unattended causing Naomi to choke and stop breathing." Father told mother "he bounced [Naomi] [to] get her breathing again," and mother believed "that is what caused the injuries." When asked about Naomi's broken leg, mother "clarified it was a fractured foot and indicated the doctor told her that Naomi's foot could have easily hit something and broke." Mother also reported "she was moving out of her parents' home and obtaining her own residence."

At some point, apparently during the September 26 meeting, Shahbazian asked mother if she could "appreciate the difference" between a person "shak[ing] a baby to stop the baby from crying" and shaking a baby "out of … frustration." Mother responded, "there is no difference and that one should never shake a baby."

Shahbazian concluded: "The nature of the injuries to Naomi and [mother's] belief that her husband injured Naomi by bouncing her to get Naomi to start breathing are not

6

consistent with medical findings, nor does [mother] understand the nature of the injuries being nonaccidental."

Cose, in a letter to Shahbazian, dated October 9, indicated Cose's last contact with mother was a counseling session on October 8, and stated mother "had difficulty acknowledging who injured her daughter and how the injuries occurred." Cose reported that mother had repeated father's account that in the first incident he had "propped the bottle up to feed Naomi when she began to choke and stop breathing." As to the second incident, mother stated she "noticed that [Naomi's] breathing was 'not right' and yelled for [father]," and she "believed that [father] attempted to startle Naomi by 'bouncing' her to help her breath[e]." Cose further reported that mother stated, "as of September 10, 2013[,] she has separated from her husband" and that she is willing to seek a restraining order and obtain a divorce "if this would help prove she is serious about the separation."

*Six-month Review Hearing*

The six-month review hearing was conducted over three days: December 9, 10 and 12.

Naomi's foster mother testified to the following: She is, and has been since June 2013, Naomi's foster mother. In the latter part of September, she saw mother and father together in a Walmart store in Patterson, walking next to each other as mother pushed a shopping cart. In the early part of October, she saw mother and father together, traveling in a car in Patterson; father was driving.

The foster mother further testified that on September 9, she was with mother at a doctor's appointment, and that mother said "she [mother] needed to announce that someone had done it, she had left [father] and was moving in with her parents." While in the examination room waiting for the doctor, mother telephoned father, and said to Naomi, "'Say hi to Daddy. Daddy it's your baby.'"

Cose testified to the following: The purpose of her counseling of mother was to "address [the] objective" of the case plan that mother "identif[y] who the perpetrator was,

7

acknowledg[e] that her baby was non-accidentally injured, com[e] to terms with safety for herself and her child." Cose's most recent counseling session with mother was on December 5.[5] Since September 10, when mother told Cose she had "decided to dissolve the relationship with [father]," mother was "making progress now" compared to the "the beginning of services." She is now "towards the end of the beginning, in the middle [stage of that progress]. She's coming along, but it's just taken a little while." Her "progress" consisted of "a safety plan on how she will help keep her daughter safe," but because she does not have custody of Naomi she has not been able to "put [the safety plan] into action." Mother "reports that she believes [father] had shaken [Naomi]." On December 5, mother showed Cose "actual paperwork" proving that she had filed for dissolution of marriage. That mother said she was leaving father shortly after Dr. Moles recommended that Naomi not be returned to mother unless she was living separately from father "leaves [Cose] to question if [mother's] decision was a result of the psychological evaluation conducted by [Dr.] Moles or if it was her decision for herself and her baby." That mother "is saying … she has the intent of having no contact" with father, but "then is seen out in the community with him" indicates mother "may be confused [as to] what she wants."

On December 4, mother spoke with Cose on the telephone and told her about an incident in Patterson that involved "shoving." At their in-person discussion on December 5, mother stated she had gone to father's home "to confront him about financial matters," at which time father "pushed" her and she "pepper-sprayed" him. Cose did not know whether father pushed her before or after mother pepper-sprayed him. Thereafter, mother stated, father "showed up with a golf club" at mother's home and "attempted," unsuccessfully, "to break windows." Also on December 5, mother stated that when she was pregnant, father threw a "light" box "at her stomach." This "really upset" mother.

---

[5]     Cose testified on December 9.

At some point prior to December 4, mother stated she would seek a restraining order against father, "if she needed to." At that time, Cose gave mother "information to contact Haven." Cose also contacted Haven while mother was in Cose's office "so that she could have an outside resource to help her if necessary."

"[A]s of yet," Cose had not addressed with mother in counseling the question of "how mother could safely interact with [father] if they needed to discuss any [coparenting] issues." In the event services were continued, that was "something [Cose] would continue to work with mother on."

Mother "mentioned [to Cose] that she need[ed] help to stay away from [father]," and Cose "explained to her that … she could benefit from having stronger boundaries." Mother "agreed … and said that she needed help in doing so." When asked if she had discussed with mother "[mother's] judgment and appropriate boundaries," Cose responded: "Not to the degree that it needs to be. A majority of the focus has been on [mother] dealing with her emotions and dealing with [father] regarding the separation and the feelings that she's been having around that."

On December 9, Shahbazian testified to the following: She is the "family reunification worker" assigned to mother's case. Prior to the previous Tuesday, December 3, mother had consistently stated she believed that Naomi's injuries occurred when she had stopped breathing and father, in an effort to revive her, "bounced" her. But on December 3, she reported for the first time that father "shook [Naomi] because he was mad."

Mother stated, "she had no contact with [father]." However, later in the one hour and 45 minute discussion, "when pressed," she stated that "a couple of weeks" before, she went to father's home to discuss an overdraft on their joint bank account, at which time he pushed her and "slam[med] the door on her, hitting her with the door," and she pepper-sprayed him. Later, father saw her driving around and "threatened to break a window."

9

Shahbazian did not provide mother with a domestic violence referral after mother told her about this incident because, as mother recounted the incident, it was "more of poor decision-making and mutual combat," rather than a "domestic violence situation." Mother never told Shahbazian about the incident in which father threw the box at mother's stomach while she was pregnant. Prior to December 3, Shahbazian asked mother "multiple times" if she had "any … concerns with regard to father's propensity for violence or anger," and she "consistently responded that "she never saw any anger or temper or issues with violence."

Mother testified to the following: "[S]ometime in September," she "came to the conclusion" that father caused Naomi's injuries when he "shook [her] violently." She "wasn't physically present to see" how Naomi was injured and initially "didn't think [father] actually caused these injuries." Prior to the point in September when she reached the conclusion she did, she "didn't think that [father] actually caused these injuries," and she "wasn't completely sure … if it was an accident or non-accident, and that's what [she] struggled with to understand." It took her until September to reach the conclusion she did because, she explained: "My daughter, I have to think about her. I have to be a mother first. And it took me a long time, and it was a process. It wasn't something easy for me."

On September 10, mother moved out of the home she was sharing with father. On September 9, when she told father she was moving out, he told her "basically to put [her] foot up [her] ass," that "he was going to do anything that was possible of him to keep [her] away from [Naomi] and that he wasn't going to let [mother] keep [Naomi]." Father also told mother, "'I know where your family lives ….'"

At the conclusion of the hearing, the court stated: "[M]y real concern throughout … this trial is that [mother] is really paying lip service to what she is supposed to say and what she is supposed to believe, but I don't believe her actions really support that belief." The court found it "troubling" that mother, who was separated from father at the time of

10

the jurisdiction hearing, chose to move back in with him after the disposition hearing, "when he very likely was the perpetrator of the injuries [Naomi suffered]." The court was "also very concerned about mother's protective capacity, because she seems to be really lacking in good judgment," as evidenced by going to father's home in November, after father had threatened her in September, and confronting him about a bank overdraft. Mother's behavior "makes [the court] believe that maybe the foster parents [*sic*] are correct, that [mother] did say that I'm going to get Naomi back and we're going to be together in one big happy family." The court "can't help but feel that maybe [mother is] playing a game on this Court and saying what she thinks everybody wants to hear, but not really feeling that way truly in her heart."

The court found that mother had "participated regularly" but had "[not] made substantive progress in the case plan." The court also found "by clear and convincing evidence that reasonable services were either provided or offered to the parents," and stated it was "not convinced that there is a substantial probability that Naomi could be returned to [mother's custody by the time of the 12-month review]."

## DISCUSSION

### *Substantive Progress*

Section 366.21(e) governs the proceedings at the six-month review hearing. Section 366.21(e) provides that where, as here, the minor who is the subject of the section 300 proceeding is under three years of age on the date of the initial removal from the home of the parent(s), a finding by clear and convincing evidence that the parent failed "to make substantive progress in a court-ordered treatment plan" is a prerequisite to the setting of a section 366.26 hearing. (§ 366.21(e), 3d par.)

Here, as indicated above, the court set a section 366.26 hearing after making a finding that mother had failed to make substantive progress in the treatment plan. Mother argues, as best we can determine, that the evidence was insufficient to support this finding. We disagree.

11

"We review the correctness of an order pursuant to section 366.21 to determine if it is supported by substantial evidence." (*In re Shaundra L.* (1995) 33 Cal.App.4th 303, 316.) "[T]he substantial evidence test applies to determine the existence of the clear and convincing standard of proof ...." (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.) In applying the substantial evidence test, we adhere to the following principles: "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

As also indicated above, one of the objectives of the court-ordered treatment plan was the following: "The parents shall recognize the injuries to the child were not accidental consistent with the medical findings."

From the evidence summarized earlier, the court reasonably could conclude that from early February, when mother first spoke to a social worker about Naomi's injuries, to December 3, a few days prior to the six-month review hearing—when, according to social worker Shahbazian's testimony, mother for the first time ascribed Naomi's injuries to father's act of violently shaking the child because he was angry—mother consistently maintained—to her counselor at Sierra Vista, to the psychologist who conducted a psychological evaluation of mother, and to Shahbazian—that she believed father *accidentally* caused Naomi's injuries. We recognize that mother's December 3 statement to Shahbazian and her testimony that she accepted that Naomi's injuries were caused in a nonaccidental manner support her claim that she complied with the recognition objective. However, it is apparent from the court's remarks that the court did not credit mother's

testimony. And, under the principles of appellate review summarized above, we must accept the court's assessment of mother's credibility.

The record contains ample support for the court's finding as to mother's lack of credibility. First, mother testified that in September she came to the conclusion that Naomi's injuries were not caused in the accidental manner father had described, viz., by leaving her alone with a "propped up" bottle, but by his violently shaking her. Yet, mother made no mention of this conclusion to Cose or Shahbazian until December and, indeed, indicated to Shahbazian in late September and to Cose in October that she accepted father's account.

Second, although the evidence is in conflict, the court reasonably could have credited, and in fact apparently did credit, that, as the foster mother reported to Shahbazian, mother told the foster mother on September 9 that she (mother) intended to "blame" father for Naomi's injuries, move out of the home she shared with father, regain custody of Naomi, and then move back in with father.

Third, as the court noted, on occasion, mother's actions were at odds with her words, casting doubt on her credibility. For example, although mother testified that she left father on September 10, in part because he had threatened her family and because she realized at that point he was "not the person … [she] thought he was," there was also evidence that later in September she and father were seen walking side by side in a Walmart store and that in October she and father were seen driving together in Patterson.

Mother argues that the record compels the finding that she recognized in September that Naomi's injuries were not accidentally caused when on September 24, mother described the injuries to Shahbazian as "nonaccidental." We disagree. As indicated above, just two days later on September 26, mother told Shahbazian that Naomi was injured as a result of father leaving her alone with a propped up bottle and in October she made a similar statement to Cose and added that she believed Naomi was injured on January 28, when father "bounced" the child in an effort to get her to breathe. Although

13

on September 24, mother used the label "nonaccidental" in describing to Shahbazian the infliction of Naomi's injuries, when she explained how she believed the injuries actually occurred, she described injuries inflicted in an accidental manner.

Mother also devotes a large portion of the instant petition to challenging Shahbazian's reasoning and conclusions. However, it is the court's finding that mother did not make substantive progress in her treatment plan that we review, not the findings of the social worker.

Mother also challenges the sufficiency of the evidence supporting the court's finding of no substantive progress on the basis that various factors, she claims, show that mother did in fact progress in meeting the recognition objective. For example, she points to her professed understanding that one should never shake a baby, her development of a safety plan, and her act of separating from father as recommended by Dr. Moles in the psychological evaluation report. However, these and other factors which militate against a finding of no substantive progress do no more than create a conflict in the evidence, and as indicated above, in applying the substantial evidence test, we resolve such conflicts in favor of the court's order.

To summarize, the court reasonably could conclude that from February, soon after Naomi's injuries were discovered, until the week prior to the hearing in December, mother displayed no recognition that Naomi's injuries were not inflicted accidentally. Further, although mother claimed in December that she understood father had inflicted Naomi's injuries by violently shaking the child out of anger, and that she (mother) had come to this conclusion in September, the court did not believe her, and it is beyond this court's power to review the trial court's credibility determinations. On this record, substantial evidence supports the conclusion that as of the time of the hearing, mother had not recognized that Naomi's injuries were not caused accidentally. Moreover, the court could also reasonably conclude that mother's failure to understand this aspect of the cause of Naomi's injuries would create a serious possibility of further injury to Naomi,

14

should she be returned to mother, and thus the recognition objective was a crucial component of mother's case plan. We conclude therefore that because substantial evidence supports the conclusion that mother failed to comply with the recognition objective, substantial evidence also supports the court's finding that mother did not make substantive progress in the case plan.

### *Reasonable Services*

Under section 366.21(e), where, as here, the minor who is the subject of the section 300 proceeding is under three years of age on the date of the initial removal from the home of the parents, even if the juvenile court has a made a finding that the parent has not made substantive progress in a court-ordered treatment plan, the court may not, at the six-month review stage, set a section 366.26 hearing and terminate services if it finds "reasonable services have not been provided" to the parent(s). (§ 366.21(e), 3d par.) Here, as indicated above, the court found that reasonable services were provided to mother. Mother contends the evidence was insufficient to support this finding. We disagree.

A finding that reasonable services were provided, like other findings under section 366.21, is reviewed under the substantial evidence test. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).)

"'In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' [Citation.]" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48 (*Julie M.*).) "Services will be found reasonable if the Department has 'identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult….'" (*Alvin R., supra*, 108 Cal.App.4th at pp.

972-973.) "The adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 (*Ronell A.*).)

The problem that led to the loss of custody was that Naomi suffered serious injuries while in the care of her parents, neither of whom could offer anything approaching a satisfactory explanation as to how those injuries occurred. In an effort to address this problem, mother was offered and received services including a psychological evaluation, parenting classes, and individual counseling, with the last of these services, according to mother's counselor, directed at "address[ing] [the] objective" of the case plan that mother "identif[y] who the perpetrator was, acknowledg[e] that her baby was non-accidentally injured, com[e] to terms with safety for herself and her child." The foregoing constitutes substantial evidence that mother was offered reasonable reunification services.

Mother faults the services offered and provided on a number of bases. She complains she was not offered services relating to coparenting, codependency and assisting victims of domestic violence. In this regard, mother notes that Shahbazian did not provide her with a referral for services after Shahbazian learned of the incident in which father pushed mother, and that Cose, although she was "willing and about to embark on issues of boundaries and co-parenting[,] … had not gotten there yet."

However, it appears mother was offered domestic violence services. When mother spoke to Cose about seeking a restraining order, Cose gave mother a referral to Haven—apparently a shelter or some other kind of facility that provides assistance to domestic violence victims—and called that facility for mother. Moreover, mother never raised any concerns related to domestic violence until early December. Assuming for the sake of argument that Shahbazian was remiss in not offering mother a domestic violence services referral in December, and that Cose can be faulted for focusing on issues relating to mother's meeting the recognition objective to the exclusion of other issues, these

16

factors suggest, at most, that mother did not receive the services she might have received "in an ideal world." (*Julie M.*, *supra*, 69 Cal.App.4th at p. 48.)

Mother also argues that the agency did not provide reasonable services because, she suggests, the agency did not offer additional services in response to Dr. Moles's psychological evaluation. However, the only services Dr. Moles recommended were continued "parenting and individual counseling services at Sierra Vista," which mother, in fact, continued to receive.

Mother also challenges the court's finding that reasonable services were provided on the basis that Shahbazian imposed a requirement on mother not set forth in the treatment plan by insisting that mother identify father as the perpetrator before she (Shahbazian) would recommend continued services. The record does not support the factual premise of mother's claim, i.e., that Shahbazian imposed requirements on mother not set forth in the treatment plan, and in any event this claim has no bearing on whether the agency offered reasonable reunification services to mother.

Finally, mother argues "it appears that [Shahbazian] … delivered incorrect information about the child's injuries to the service providers." Mother provides no explanation of this claim, although it may relate to an erroneous statement in an agency report that Naomi had suffered a skull fracture. (See, *ante*, fn. 3.) In any event, this claim also has no bearing on the services mother may or may not have been provided.

***Substantial Probability of Return of Minor to Mother***

Mother, after discussing at some length *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166 (*M.V.*), concludes her discussion of that case with the following quotation: "'[S]ervices may be terminated at the six-month stage only when "parental unfitness is so well established that there is no longer 'reason to believe that [a] positive, nurturing parent-child relationship[ ] exist[s]' [citation], and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished."' [Citation.]" (*Id.* at pp. 182-183.) Mother argues: "The facts of this case

17

do not support the aforementioned notion." To address this contention, we must examine the "notion" set forth in the statement from *M.V.* quoted above in the context of that case.

Under section 366.21(e), where, as here, the minor who is the subject of the section 300 proceeding is under three years of age on the date of the initial removal from the home of the parent, even if the juvenile court has a made a finding that the parent has not made substantive progress in a court-ordered treatment plan, the court may not, at the six-month review stage, set a section 366.26 hearing and terminate services if it finds "'there is a substantial probability that the child … may be returned to his or her parent … within six months … '; or … 'reasonable services have not been provided …' to the parent[s]. (§ 366.21, subd. (e).)" (*M.V.*, *supra*, 167 Cal.App.4th at p. 176.)

The *M.V.* court made the statement quoted above at the conclusion of its analysis comparing the substantial probability of return standard set forth in section 366.21(e) with a similar provision in the portion of section 366.21 that governs 12-month review hearings, viz., section 366.21, subdivision (g)(1) (section 361.21(g)(1)). That portion of the statute provides, in relevant part, that at the 12-month review, the court may continue the case to the 18-month review "only if it finds that there is a substantial probability that the child *will be* returned to the physical custody of his or her parent …." (§ 366.21(g)(1), italics added.)

The court compared the two provisions: "subdivisions (e) and (g)(1) of section 366.21 present distinct legal standards: subdivision (e) asks whether there is a substantial probability the child *may* be reunited with the parent by the 12-month review; subdivision (g)(1) asks whether there is a substantial probability the child *will* be reunited with the parent by the 18-month review." (*M.V.*, *supra*, 167 Cal.App.4th at p. 180.) This comparison highlights a "crucial difference[] between the 'substantial probability' inquiry required at the six-month review and the inquiry required at the 12-month review," viz., the following: "the court is not charged by section 366.21, subdivision (e), with finding a substantial probability the child *will* be returned. The court is charged with

18

finding a substantial probability the child *may* be returned.  Literally, the statute commands the court to determine whether there is a strong likelihood of a *possibility* of return (not simply a strong likelihood the return will in fact occur).  The word 'may' alters the typically high burden of 'substantial probability.'" (*Id*. at pp. 180-181, fn. omitted.)[6]  The statutory scheme is one of "'escalating standards'"; under the "more lenient standard" of section 366.21(e), the continuation of services is "presumed," whereas when one moves to the 12-month stage (§ 366.21(g)(1)), services are "possible." (*M.V.*, *supra*, 167 Cal.App.4th at p. 179.)

Mother suggests the record does not establish, in the words of the passage she quotes, that "there is no longer 'reason to believe'" that mother can provide "positive, nurturing" parenting (*M.V.*, *supra*, 167 Cal.App.4th at p. 183), and that therefore the court was compelled to make the finding of substantial probability under section 366.21 that would have precluded the setting of a section 366.26 hearing.  The court made, in essence, the opposite finding, stating it was "not convinced that there is a substantial probability that Naomi could be returned to [mother's custody by the time of the 12-month review]."  But the statement from *M.V.* regarding the standard at the six-month review quoted by mother must be read in the context of the statutory requirements for such a finding.  That is, the court must continue services unless "there is a *strong likelihood* of a *possibility* of return…." (*M.V.*, *supra*, 167 Cal.App.4th at p. 181, first italics added.)  The record, however, does not compel such a finding.  There may be *some* likelihood of such a possibility, but, given that the court, as demonstrated above, reasonably could conclude that despite the passage of more than 10 months from the time mother learned of the medical findings as to the causes of Naomi's injuries, to the hearing in December, she had not recognized, consistent with those findings, that father inflicted those injuries nonaccidentally, and that as a result, return of the child to mother would put

---

**6**    The court noted:  "Admittedly, the statute is unwieldy.  But we must honor the law as written by the Legislature." (*M.V.*, *supra*, 167 Cal.App.4th at p. 181.)

19

the child in danger.  From this conclusion, the court reasonably could have concluded further that there was not a *strong* likelihood of the possibility of return.  The court's finding that there did not exist a substantial probability that Naomi could be returned to mother within the statutory time frame was supported by substantial evidence.  Accordingly, that finding cannot be disturbed on appeal.

## DISPOSITION

The petition for extraordinary writ is denied.  This opinion is final forthwith as to this court.